# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **Petition of David K. Morgan, as Foreign** | ) | |
| **Representative of United Kingdom Foreign** | ) | |
| **Proceeding respecting** | ) | **Case No. 09-08706** |
| **THE MEADOWS INDEMNITY** | ) | **Chapter 15** |
| **COMPANY LIMITED** | ) | **Judge Lundin** |
| | ) | |
| **Debtor in a Foreign Proceeding.** | ) | |

## DECLARATION OF GERALDINE EMMA QUIRK

I, Geraldine Emma Quirk, declare under penalty of perjury as follows:

1.      I am a solicitor of the Supreme Court of England and Wales and have been since 1994. I am a partner in the corporate insurance department of the firm of Clyde and Co. LLP. I have been involved over the years with many aspects of insolvency and restructuring in the insurance industry in the United Kingdom ("UK"), including advising insurance companies on the preparation of schemes of arrangement under Part 26 of the Companies Act of Great Britain 2006 (the "Companies Act") and the previous Section 425 of the UK Companies Act 1985.

2.      I have acted, and continue to act, as the primary UK legal adviser to The Meadows Indemnity Company Ltd. (the "Company") with respect to the proceedings respecting and business of the UK entity that is the Debtor in the above-captioned Chapter 15 case and am fully familiar therewith. I submit this declaration in support of the petition for recognition and relief (the "Verified Petition") made pursuant to Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code") by David K. Morgan, the duly authorized Foreign Representative of the Company (the "Petitioner").

418474-1

## Introduction

3.      The Verified Petition seeks from this Court recognition as a foreign main proceeding under the Bankruptcy Code (or as a foreign nonmain proceeding if the Court determines that this proceeding may not be treated as a foreign main proceeding as asserted), and relief, including permanent injunctive relief, respecting and in aid of the UK scheme of arrangement described below (the "Scheme"). Duly authorized notice of the Scheme was provided to all potential creditors (for whom address details were available), along with an Explanatory Statement which, among other things, advised creditors of the intent to seek recognition and relief from the United States Bankruptcy Court in aid of the Scheme. The Scheme was duly sanctioned under English law by the UK High Court of Justice of England and Wales (the "UK High Court") following two duly authorized and noticed Meetings of Creditors at which the requisite majority in number and value of creditors voted in favour of the Scheme. The Scheme became effective as of July 20, 2009. A true and correct copy of the Scheme is included in **Exhibit 1** of the indexed **Appendix of Exhibits** (the "**Appendix**") which has been filed contemporaneously with the Verified Petition and this Declaration and which is incorporated by reference as if fully set forth herein.

4.      The Company was formed on April 29, 1976, in St. Peter, Port, Guernsey, Channel Islands as an insurance and reinsurance company.  It was a wholly-owned subsidiary of Gould, Inc, whose headquarters were in Chicago, Illinois.  Initially, the Company participated only in insuring and reinsuring its parent's property and activities, but in 1978 the Company began to participate in external reinsurance risks.  The Company's book of business included Aviation, Casualty, Financial, Marine, Non-marine, Multi-line, Professional Indemnity, and

Property accounts. The majority of these accounts were underwritten through the London market.

5. In May of 1985, the Company formed the Meadows Syndicate, Inc. (the "Syndicate"), as a member of the New York Insurance Exchange. In 1988, Meadows Syndicate withdrew from the Exchange and entered into an assumption agreement with the Travelers Indemnity Company ("Travelers"). In turn, the assumption agreement was reinsured by the company. Subsequently, in 1992 Meadows Syndicate was dissolved and its remaining assets and liabilities were transferred to the Company in accordance with US law. Travelers and the company (both on its own account and as successor in interest to Meadows Syndicate) have entered into an agreement terminating their obligations under the reinsurance agreement and the assumption agreement. Notwithstanding the company's belief that, under US law, it is liable for the policies and reinsurance contracts underwritten by Meadows Syndicate due to the dissolution of Meadows Syndicate and the transfer of its liabilities to the Company, the Company has also entered into deed in favour of the policyholders of Meadows Syndicate assuming liability for their policies.

6. In early 1991, the Company ceased assuming new reinsurance and began the process of settling its outstanding claims (run-off).[1] The Company has since continued its run-off process from 1992 until the present time. The majority of the Company's insurance liabilities arising out of the policies it issued have been settled leaving only a relatively small amount of claims outstanding.

7. The Company's directors determined that a scheme of arrangement under Section 425 of the Companies Act 1985 of Great Britain offered a cost-effective process for the

---

[1] When an insurance company enters run-off, it determines, settles, and pays liquidated claims of insureds as and when they arise. A run-off, therefore, typically may take twenty or more years to complete in the case of business of the type underwritten by the Company.

418474-1

3

Case 3:09-bk-08706 Doc 4 Filed 07/31/09 Entered 07/31/09 17:24:33 Desc Main
Document Page 3 of 15

determination and payment of all present, future, and contingent claims in a speedy and orderly fashion.

8.     As more fully described below, a scheme of arrangement such as the Scheme respecting the Company is a well-established mechanism for dealing equitably with the run-off of insurance business and for effectuating such run-off in an orderly and efficient manner.

9.     By order dated March 11, 2009 (the "Convening Order"), the UK High Court declared that it had jurisdiction to sanction the Scheme and granted leave to convene two separate meetings of Scheme Creditors for the purpose of considering, and if thought fit, approving (with or without modification) the Scheme (the "Creditors' Meetings"). The Creditors' Meetings were held on May 27, 2009, at the offices of Clyde & Co LLP, 51 Eastcheap, London, EC3M 1JP, United Kingdom. True and correct copies of the Convening Order and the Chairman's (Philip Grant's) Report of the Creditors' Meeting (the "Chairman's Report") are included in **Appendix Exhibit 8** and **Exhibit 10**, respectively. As indicated in the Chairman's Report, a majority in number and 75% in value of the Company's Scheme Creditors, at each meeting, voted in favour of enacting the Scheme. The High Court made an order sanctioning the Scheme on July 20, 2009 (the "Sanctioning Order"). A true and correct copy of the Sanctioning Order is included in **Appendix Exhibit 12**. The Scheme became effective July 20, 2009 upon the filing of the Sanctioning Order with the Registrar of Companies in England and Wales. A true and correct copy of the letter evidencing proof of such filing is included in **Appendix Exhibit 13**.

418474-1

## Schemes of Arrangement under the Companies Act

10.     A scheme of arrangement is a compromise or arrangement proposed between a company and its creditors, or any class of creditors, or between a company and its members, or any class of members, as provided for under part 26 of the Companies Act.

11.     A scheme of arrangement is a flexible method of binding a company and its creditors to a proposed course of action. The Scheme will enable the Company to discharge its obligations to Scheme Creditors over a shorter time than would be the case if the run-off of its business was to continue until all claims had materialised and been agreed and paid in the normal course. To this end, the Scheme will provide for the early payment of claims by creating a means of compromise, in respect of all present, future and contingent claims of Scheme Creditors against the Company. The benefit of the Scheme to the Company and to the Scheme Creditors is not only that the Scheme Creditors are paid early but also that the administrative costs which would be incurred through the run-off of the business in the traditional way over many years by the Company and by the Scheme Creditors will be avoided

12.     There is no requirement that a debtor be insolvent for it to be the subject of the scheme effected pursuant to part 26 of the Companies Act or the prior section 425 of the 1985 Act. Indeed, many solvent insurers in the UK have proposed and obtained the High Court's sanction of solvent schemes of arrangement under the 2006 Act and the 1985 Act.

13.     Solvent schemes have been developed to maximize the return to shareholders by reducing the cost and duration of run-offs which are projected to be solvent. In this instance, the Company has proposed a solvent Scheme, which, like other solvent schemes, is a "cut-off" scheme designed to be of short duration with a deadline for the filing of claims and a process for

Case 3:09-bk-08706    Doc 4    Filed 07/31/09    Entered 07/31/09 17:24:33    Desc Main
Document      Page 5 of 15

independent valuation of disputed claims designed to reduce the time and costs which would be incurred through litigation.

14.    A scheme, including the rules sets forth therein for treatment of claims, must be approved by the requisite majority of creditors in order to become binding and also must be sanctioned by the High Court. Thus, even if approved by creditors, the scheme still is subject to the overriding consideration that the High Court will only sanction a scheme *if it is found to be fair and reasonable in the circumstance, as more fully described below*.

**The Scheme**

15.    It is usual for a scheme of arrangement to provide for the appointment of a scheme administrator or supervisor to assist a company with the implementation of a scheme. Pursuant to the subject Scheme, Ambant Limited has been duly appointed to serve in such position ("Scheme Adviser"). The Scheme Adviser has advised the Company in relation to the implementation of the Scheme to date and will continue to do so through to its termination. The Scheme Adviser may provide advice to the Company to facilitate the carrying out of the Scheme and will have full access to the books and records of the Company.

16.    The Scheme provides for a practical and cost effective process for agreeing all Claims, including those which may not be easily evaluated, such as incurred but not reported losses. Pursuant to the Scheme, Claims which cannot be agreed will be referred to and valued by the Independent Expert in accordance with the Independent Expert Procedure, as described further below.

17.    The Scheme also seeks to minimize the costs of administering the run-off of the business covered by the Scheme by requiring that the claims of all Scheme Creditors, wherever situated, be resolved under the Scheme and within the single jurisdiction of the UK High Court.

18.     As attested by the Verified Petition, at the time of the filing of the Verified Petition, the directors of the Company were of the opinion that the Company was solvent and would be able to meet its liabilities in full.

### The Scheme Business and Claims

19.     As stated above, in early 1991, the Company ceased assuming new reinsurance and began the run-off process, which continued from 1992 until the present time. The majority of the Company's insurance liabilities arising out of the policies it issued have been settled leaving only a relatively small amount of claims outstanding.

### The Scheme Provides Just Treatment of Claims

20.     The Scheme is a cut-off scheme under which claims of Scheme Creditors to which the Company is subject at December 31, 2007 (the "Ascertainment Date"), including contingent and future claims, will be agreed, valued and paid. Scheme Creditors have a finite period within which to submit their claims, which expires at 11:59 pm (United Kingdom time) on January 18, 2010 (the "Final Claims Submission Deadline"). The earliest date for payment of eligible claims is expected to be June of 2010.

21.     In accordance with the terms of the Convening Order, notice of the Creditors' Meetings was also advertised once in each in: (i) the UK and international editions of The Financial Times; (ii) the Times; (iii) worldwide edition of Insurance Day; and, (iv) the U.S. edition of The Wall Street Journal and Business Insurance (collectively, the "Scheme Publications"). Further in accordance with Convening Order, the Scheme and the Explanatory Statement were made available on the website www.meadowsindemnity.com (the "Scheme Website") for downloading and printing. Also made available on the Scheme Website were notices sent, voting forms, certain Orders, and other relevant documents.

418474-1

22.     Notice that the Scheme had become effective, Notice of the Final Claims Submission Deadline, a Claim Form and instructions respecting its timely submission, all were sent by mail to all Notice Parties for whom addresses were available, including those located in the United States, 27 July 2009.  A true and correct copy of such notification is included in **Appendix Exhibit 14**.  In addition, such notification has been published on the Scheme Website and in the Scheme Publications. Confirmation of the publication of the Notice of Effective Date and Final Claims Submission Deadline in the Scheme Publications shall be provided to the Court upon counsel's receipt of same from the respective publications.

23.     To obtain payment on their claims, Scheme Creditors must timely submit all information relating to their asserted claims, including reference to each Insurance Contract pursuant to which such claims arise and the estimate of the value of each individual claim. Each Scheme Creditor also must provide details of the basis for calculation for its claim or claims. Scheme Creditors also are required to separate their claims into Paid Loss Claims, Notified Outstanding Loss Claims and IBNR Claims, and to present analyses and documentary evidence of all amounts claimed.

24.     The Scheme provides that, if the Scheme Creditor's estimate of the value of its claims is agreed, the Scheme Creditor will be notified within 28 days following the Final Claims Submission Deadline of such agreement and the agreed estimated value shall be the Agreed Claim in respect of such claim. If the Company does not agree with the information provided on a Claim Form, or denies liability, it shall, within 28 days of the Final Claims Submission Deadline, notify the Creditor in writing of those matters that are in dispute and the reason for such disagreement, specifying any additional information which may be required. The Scheme Creditor must provide such additional information within 21 days of such notice. The Company

then will attempt to resolve disputed matters within 63 days after the Final Claims Submission Deadline.

25.     If a Scheme Creditor fails to provide additional information and/or documentation as requested by the Company, the Company shall be entitled to make such determination of the amount being due in respect of such Claim as it sees fit on the basis of the information available to it, which determination shall be made to the affected Scheme Creditor in writing. Unless the Scheme Creditor objects to such determination within 14 days of the date of the Company's notice, the amount determined by the Company as being due in respect of the relevant Claim shall be the amount of the Agreed Claim. In the event the Scheme Creditor does so object, the Company shall within a further 7 days from the date on which the deadline for objections by the Scheme Creditor expired refer such Claim to the Independent Expert as a Disputed Claim and shall send written notice to the affected Independent Expert to the effect that such Claim has become a Disputed Claim and has been referred to the Independent Expert.

26.     If the disputed matters are not resolved between the Scheme Creditor and the Company before the deadline, or the Company in its absolute discretion concludes at any time before the expiration of that deadline that agreement cannot be reached, the Company, shall, within a further 14 days from the expiration of the deadline or from the date on which such conclusion was reached, either: (i) refer such Claim to the Independent Expert as a Disputed Claim for valuation according to the Independent Expert Procedure and shall send written notice to the affected Scheme Creditor to the effect that such Claim has become a Disputed Claim and has been referred to the Independent Expert; or (ii) send to the affected Scheme Creditor written notice of the value for which it proposed to admit each of the Scheme Creditor's Claims for payment in the Scheme.

418474-1

27.     The value of each of the Scheme Creditor's Claims as set out in any notice shall be the Agreed Claim in respect of such Claim, unless the Scheme Creditor objects to such value by giving notice in writing received by the Company within 14 days of the date of the Company's notice. In the event the Scheme Creditor does so object, the Company shall, within a further 7 days from the date on which the deadline for objections by the Scheme Creditor expired, refer such claim to the Independent Expert as a Disputed Claim for valuation according to the Independent Expert Procedure and shall send written notice to the affected Scheme Creditor to the effect that such Claim has become a Disputed Claim and has been referred to the Independent Expert.

28.     Upon referral of a Disputed Claim to the Independent Expert, the Company must provide a copy of both the Claim Form completed by the Scheme Creditor, including any accompanying supporting schedules or evidence relating to such Claim and a copy of any notice, statement or correspondence sent or received by the Company in connection with the Claim. The Independent Expert will have access to all of the records and information in the possession or control of the Company. The Independent Expert, within 14 days of receipt of the paper documents, must notify the relevant party whether the Independent Expert requires further documents, data or information (to be provided within 21 days of such a request) or the appearance of the parties before him (which be within a further 21 days after receipt of such notice). Pursuant to the Scheme, the Independent Expert is entitled to establish procedures for the appearance of the parties before him. The Independent Expert must notify the parties of his decision in respect of any Disputed Claim by writing within 21 days of the provision of documents or appearance of the parties before him, and that decision shall, to the extent permitted by law, be final and binding on the parties.

29.     Following determination or agreement of a Scheme Creditor's Claim, the Scheme provides that the Ascertained Claim will be determined by deducting from the Agreed Claim any sums that are the Scheme Creditor's share of the costs and expenses of the Independent Expert, then applying any applicable set-off, and then deducting any applicable Security. Any sum remaining due to the Scheme Creditor following completion of this calculation shall be binding on the affected Scheme Creditor, the Company, and all Scheme Creditors as the amount of that Scheme Creditor's Ascertained Claim.

30.     As soon as practicable following determination of all Ascertained Claims in accordance with the provisions of the Scheme, the Company shall review its assets and liabilities and determine the Available Distributable Amount, being the amount which in the opinion of the Company is prudently available at the time for payment to Scheme Creditors in respect of Ascertained Claims. As soon as may be practicable and in any event within 14 days of the determination of the Available Distributable Amount, if the Company determines that the Available Distributable Amount is sufficient to meet Ascertained Claims in full, it shall make payment in full to Scheme Creditors in respect of their Ascertained Claims.

### Identification and Notification of Creditors and other Interested Parties

31.     Pursuant to a Practice Statement respecting section 425 of the Companies Act 1985 (now part 26 of the Companies Act 2006) issued by the Chancery Division of the High Court on 15 April 2002 (the "Practice Statement"), a scheme applicant is required, by evidence in support of the application or otherwise, to draw to the attention of the Court as soon as possible in the scheme process any issues which may arise respecting the constitution of meetings of scheme creditors or which otherwise might affect the conduct of those meetings ("Creditor Issues").

32.     Unless there are good reasons for not doing so, the Practice Statement requires that the applicant should take all steps reasonably open to it to notify any person affected by the Scheme that it is being promoted, the purpose which the Scheme is designed to achieve, the meeting(s) of creditors which the applicant considers will be required and their composition, prior to the application for leave to convene meetings(s) of creditors which the applicant considers will be required and their composition, prior to the application for leave to convene meeting(s) of creditors.

33.     The Company wrote to creditors dealing with the points required to be covered by the Practice Statement by way of a letter dated 21 November 2008 (the "PSL"). The Company's Scheme Creditors are all claimants under policies of insurance and reinsurance and they are all subject to identical treatment under the Scheme in relation to the submission, valuation and payment of Claims. However, in the recent cases of Re: British Aviation Insurance Company Limited ("BAIC") and Re: Sovereign Marine & General Insurance Company Limited ("Sovereign") the UK High Court concluded that creditors with, in the language of the Scheme, Notified Outstanding Claims have different rights to creditors with IBNR claims. In light of this and having given careful consideration to the Company's book of business, the Company considered that it was prudent to hold two separate meetings, one meeting of Scheme Creditors with Notified Outstanding Claims and one meeting of Scheme Creditors with IBNR Claims for the purpose of considering and voting on the Scheme. The Company's intention to convene two meetings on that basis was set out in the PSL. The Company did not receive any representations in relation to Creditor Issues or any objections to the proposal to hold two class meetings to vote on the Scheme. A true copy of the PSL is included in **Appendix Exhibit 6**.

**Convening Hearing**

34.     As previously stated, on March 11, 2009, the UK High Court issued an Order (the "Convening Order") directing the Company to convene two separate meetings of Scheme Creditors, one meeting of Scheme Creditors with Notified Outstanding Claims and one meeting of Scheme Creditors with IBNR Claims (the "Creditors' Meetings") for the purpose of considering, and if thought fit, approving the Scheme (with or without modification), and appointing Philip Grant to act as Chairman of the Creditors' Meetings and to report to the UK High Court the results of the Creditors' Meetings. A true and correct copy of the Convening Order is included in **Appendix Exhibit 8**.

35.     On March 16, 2009, pursuant to the Companies' Act, notice of the Creditors' Meetings was sent by mail to all identified Notice Parties for whom an address could be obtained, along with the voting form, proxy form and the Explanatory Statement.

36.     An Explanatory Statement respecting a scheme of arrangement pursuant to the UK Companies' Act is similar in nature and intent to the disclosure statement required to be filed and served on all creditors entitled to vote respecting a chapter 11 plan of reorganization pursuant to §1125(b) of the Bankruptcy Code. Among other things, the Explanatory Statement respecting the Scheme expressly disclosed to all Notice Parties, including those located in the United States, that assistance of the United States Bankruptcy Court might be sought in aid of the effective implementation of the Scheme through, among other relief, permanent injunctive relief barring the taking of any actions against the Company or its property to the detriment of the Scheme and Scheme Creditors.

37.     Notice of the Creditors' Meetings was also advertised in the Scheme Publications and on the Scheme Website.

### Creditors Meeting

38.     As previously stated, the Creditors' Meetings were held on May 27, 2009, and Philip Grant acted as Chairman of both meetings. At each Creditors' Meeting, a resolution was submitted to attending Scheme Creditors seeking approval of the Scheme.

39.     The resolution was passed at each Creditors' Meeting and the Scheme was approved by the requisite number of Scheme Creditors entitled to vote and present in person or by proxy and voting at each Creditors' Meeting. The results of the Creditors' Meetings were reported to the UK High Court in a report from Philip Grant, dated July 9, 2009, a true and correct copy of which is included in **Appendix Exhibit 10**.

### Sanctioning Hearing

40.     Upon petition made to the UK High Court to sanction the Scheme, and hearing held thereon on July 20, 2009, at which no objections were lodged, the UK High Court issued an Order dated July 20, 2009, sanctioning the Scheme and directing the Company to deliver an office copy of the Order to the Registrar of Companies (the "Sanctioning Order"). A true and correct copy of the Sanctioning Order is included in **Appendix Exhibit 12**.

41.     A certified copy of the Sanctioning Order was duly registered with the Registrar of Companies in England and Wales on July 29, 2009 (the "Effective Date"), rendering the Scheme effective and binding. A letter containing proof of such registration is included in **Appendix Exhibit 13**.

42.     As stated above, notice that the Scheme had become effective, Notice of the Final Claims Submission Deadline, a Claim Form and instructions respecting its timely submission, all were sent by mail to all Notice Parties, including those located in the United States, on July 27, 2009.  A true and correct copy of the notice is included in **Appendix Exhibit 14**.

## Conclusion

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 31st day of July, 2009.

/s/ Geraldine Emma Quirk
Geraldine Emma Quirk